UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **Brian Paige** ) | |
| ) | |
| **Plaintiff, individually and** ) | |
| **on behalf of all others** ) | |
| **similarly situated** ) | |
| ) | |
| ) | |
| v. ) | Case No.: 3:18-cv-00058-JHM |
| ) | |
| **Bitconnect International PLC,** *et al.* ) | |
| ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff, Brian Paige ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, respectfully requests that this Court enter a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b) against Defendants Bitconnect International, PLC, Bitconnect LTD and Bitconnect Trading, LTD (collectively, "Bitconnect") and Ryan Maasen ("Maasen") (together, "Defendants") to freeze Defendants' assets and require Defendants to disclose the Bitcoin and other wallet addresses so their money can be monitored.

**I.   The Court Can Issue An Injunction to Freeze Assets in this Action for Equitable Relief.**

Under the general rule, federal courts lack authority to freeze assets of a defendant before the claims have been brought to judgment. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999).  "However, when the plaintiff is seeking equitable relief, as opposed to merely legal damages, the federal courts have the authority to issue a

preliminary injunction in order to freeze the assets of a defendant if the requirements for a preliminary injunction[1] are otherwise satisfied." *Clayton v. Heartland Resources, Inc.,* 2008 WL 5046806, at *4 (W.D. Ky. Nov. 21, 2008) (citing *Grupo*, 527 U.S. at 324-25).

Here, Plaintiff and the Class seek equitable relief in addition to their legal remedies, and are entitled to an injunction to maintain the status quo until the claims in the Complaint can be resolved. Amongst other claims and remedies sought, Plaintiff alleges violations of federal securities laws, Kentucky securities law, and breach of contract, and requests relief in the form of "specific performance of the contract between Bitconnect and Plaintiff and the Class," as well as "[i]njunctive relief in the form of a rescission, refund or replacement program to make Plaintiff and the Class whole." *See* Class Action Complaint (Docket 1-1) at 2, 26.

In *Deckert v. Independence Shares Corp.*, the Supreme Court held that a claim by a purchaser of a security to rescind a fraudulent sale and obtain restitution of the consideration paid is a claim for equitable relief, and that a preliminary injunction was appropriate to maintain the status quo where there was real risk of insolvency and dissipation. 311 U.S. 282, 288-89 (1940). Likewise, a preliminary injunction is an appropriate remedy where a plaintiff seeks specific performance of a contract. *See Roller Bearing Industries, Inc. v. Paul*, 2010 WL 1257715, at *1 (W.D. Ky. Mar. 26, 2010) (citing *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222-23 (10th Cir. 2009).

Accordingly, Plaintiff is entitled to a temporary restraining order if the other requirements for a temporary restraining order have been met. For the reasons described below, Plaintiff is entitled to such relief.

---

[1] "The same standard generally applies to the issuance of a temporary restraining orders and preliminary injunctions." *Midwest Retailer Assn. Ltd. v. City of Toledo,* 563 F.Supp.2d 796 (N.D. Ohio 2008) (citing *Northeast Ohio Coal. For Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).

## II. A Temporary Restraining Order Is Appropriate to Prevent Immediate and Irreparable Harm.

In considering a temporary restraining order, the Court must consider the following: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a restraining order, (3) whether granting the restraining order would cause substantial harm to others, and (4) whether the public interest would be served by granting the restraining order. *Ohio Rep. Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (citation omitted). These factors should be balanced against one another, such that "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay." *Michigan Coalition of Radioactive Material Users, Inc. v. Gripentrog,* 945 F.2d 150, 153 (6th Cir. 1991). Stated another way, "[t]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

Here, Plaintiffs can demonstrate a high likeliness of success on the merits with a very high risk of irreparable injury to Plaintiff and the Class. Absent a temporary restraining order, Plaintiff and the Class face a significant risk that Defendants will dissipate their assets or otherwise transfer the money in a way that cannot be traced or recovered. Without an injunction, Plaintiffs may be stripped of their equitable remedies of rescission and restitution of consideration paid. The unique nature of cryptocurrency makes relief here non-burdensome. That is, every transaction on the Bitcoin blockchain and even the exact amount and source of Bitcoin contained in every Bitcoin wallet is fully public information. However, the actual identity of the wallet holder is not. Plaintiff is simply asking for the Defendants to provide a list of their wallets - something fully available in

3

discovery - to prevent Defendants from dissipating the ill-gotten gains of the scheme it shut down 10 days ago.

### A. Plaintiff Has A Strong Likelihood to Succeed on the Merits.

Plaintiff's claims will succeed on the merits. The harms alleged in the Complaint filed contemporaneously with this Motion make clear that Bitconnect, made up of several British entities, was both a pyramid scheme and a Ponzi scheme. In essence, Defendants participated in a so-called "investment" scheme in which it lured in users through promoters, such as Maasen, who endorsed the extraordinary results they had received from Bitconnect. These promoters received a bonus from Bitconnect for each user recruited to Bitconnect.

Bitconnect claimed to offer a community-driven cryptocurrency that allowed users to store and invest their wealth. In its simplest terms, Bitconnect offered and sold investments through its "BitConnect Lending Program." In this "program," users deposited Bitcoin, a credible cryptocurrency, into a Bitconnect depository in exchange for Bitconnect Coin ("BCC"), Bitconnect's own digital currency. Then, users "lent" their BCC back to Bitconnect so that Bitconnect could fund its secret, proprietary trading system called "volatility software." On its website, Bitconnect *guaranteed* an average daily interest rate of 1%, with bonuses, and a return of principal after a certain period of days. Maasen encouraged his viewers, including Plaintiff and the Class, not to keep their investment returns, but instead, to re-invest the daily interest earnings back into Bitconnect. As a result, users never actually made money, but the money generated by the "program" keep getting re-circulated into Bitconnect.

On January 4, 2018, the Texas State Securities Board issued an emergency cease and desist order against Bitconnect for violating state securities law. On January 12, 2018, North Carolina issued a cease and desist order against Bitconnect for violating state securities law. On January

13, 2018, the Bitconnect website went down. At first, Bitconnect claimed to its users that it had been experiencing "server issues," but within a few days, Bitconnect announced the closure of its "lending program," and its promotors, including Maasen, furiously deleted their promotional videos and materials from the internet. When the lending program closed, the value of BCC plummeted from approximately $440 per BCC to approximately $11 per BCC. At that point, Plaintiff and the Class, many of which had invested thousands of dollars, were left with valueless digital tokens.

These allegations rely extensively on information provided on Bitconnect's website, bitconnect.co, and are bolstered by a single remaining video by Maasen, who claimed to have benefited from the fraudulent scheme and urged others to "invest" with Bitconnect. Based on available information, Bitconnect offered and sold securities to Plaintiff and the Class, guaranteed returns on those "investments," but failed to make good on its guarantees or bonuses. Defendants failed to disclose material information to its users, including, but not limited to, the principals of Bitconnect, information regarding the proprietary system it called "volatility software," and that Bitconnect and its agents had failed to register with appropriate regulatory bodies. To the contrary, Bitconnect touted its "lending program" as a "safe way to earn a high rate of return on . . . investment[s] without having to undergo a significant amount of risk." Based on this fraudulent behavior, Plaintiff and the Class asserted claims for: (1) violation of Kentucky securities law; (2) violation of federal securities law; (3) breach of contract; (4) fraud by concealment; and (5) violation of the Kentucky Consumer Protection Act.

After Texas and North Carolina recognized the dangerous nature of this online operation and took action to protect their citizens, Defendants saw the writing on the wall and quickly shut down their operation. Kentucky and federal securities law does not materially differ from the

regulation of securities in North Carolina and Texas, and therefore, it is very likely that Plaintiff and the Class's claims arising from violations of Kentucky and federal securities law have a very high likelihood of success. *See Compare* N.C. Gen. Stat. §§ 78A-1, *et seq.* (requiring registration and honest disclosure when engaging in the sale of any "security," defined to include a note, stock, transferable share, investment contract, or "any interest or instrument commonly known as a security.") *and* Tex. Rev. Civ. Stat. Ann. Art. §§ 581-1, *et seq.* (requiring registration before sale of securities, defined to include share, stock, investment contract, or "any other instrument commonly known as a security," and allowing commissioner to intervene to prevent fraud in the sale or offer of securities); *and* 15 U.S.C. §§ 77a, *et seq.* (requiring registration and honest disclosure when engaging in the sale or offer of any "security" defined to include any note, transferable share, investment contract, or "any interest or interest commonly known as a security.") *and* KRS 292.310, *et seq.* (requiring registration and honest disclosure when engaging in the sale or offer of any "security" defined to include any note, transferable share, investment contract, or "any interest or interest commonly known as a security.").

The contract claims will also likely succeed because the offer of guaranteed returns in exchange for an investment by users created a binding contract that Defendants clearly breached when BCC plummeted to an essentially valueless digital token and failed to provide users with the promised returns. Success on the merits is very likely.

### B. Plaintiff Will Suffer Irreparable Injury Absent A Restraining Order.

There is significant risk that Bitconnect and its promoters, including Maasen, may dissipate money generated from Plaintiff and the Class or dump it into another scam. As evidence of this, just days after the implosion of Bitconnect, on January 25, 2018, Mr. Maasen posted videos on his YouTube.com account promoting a new "lending" site called Davor, which is exactly like

Bitconnect. *See* https://www.youtube.com/watch?v=az7vh1dGIpM (last accessed January 25, 2018). Moreover, available evidence makes clear that Bitconnect has been far from transparent with its users since it has come under scrutiny by North Carolina and Texas. After the issuance of cease and desist orders, Bitconnect advised its members it would be temporarily shut down to address a server issue. Within days, it announced the closure of its lending platform, promising repayment of its BCC at $363 per coin. However, the price of BCC has dropped drastically since this, leaving users with pennies on the dollar of their original investments.



7

Considering the unreliability and past fraudulent tactics of Defendants, it is imperative to freeze Defendants' assets to maintain the status quo to avoid dissipation of the money illegally taken from Plaintiff and the Class. Requiring Defendants to produce their addresses for their digital wallets will allow the parties to monitor the funds to track any attempts at dissipation.

### C. The Restraining Order Will Not Cause Harm to Others.

The Restraining Order will not harm others. Bitconnect has shut down its website and lending platform, presumably the only business purpose for which it had been created. Accordingly, it is a non-operational business entity, which has exposure to significant liabilities to Plaintiff and the Class. An order forbidding Bitconnect from moving its assets will at worst delay Bitconnect from winding-up its affairs, and at best, provide a maintenance of the status quo for Plaintiff and the Class to recover the billions of dollars illegally obtained through Bitconnect's fraudulent scheme.

With respect to Maasen, the restraining order will prevent him from using some of his cryptocurrency assets, but given the likelihood he engaged in illegal promotion and sale of securities by participating in a pyramid and Ponzi scheme, the injury to Maasen is greatly outweighed by protecting the thousands who relied on Maasen's representations when investing in Bitconnect. In addition, as Maasen is promoting another lending site similar to Bitconnect, it is likely he is still actively trading and investing cryptocurrency and not converting this to cash to pay for living expenses.

### D. The Public Will Be Served by Granting the Restraining Order.

The public interest strongly supports a temporary restraining order here. Based on available information, millions of Americans may have invested in Bitconnect and have lost money in its fraudulent scheme. There may be several billion dollars implicated in this litigation,

and the public will be best protected by a maintenance of the status quo of a non-operational business and promoter who continues to recklessly promote risky cryptocurrencies without providing full disclosure to his listeners.

### III.     A Temporary Restraining Order Without Notice to Defendants Is Appropriate.

This Court may issue a Temporary Restraining Order without written or oral notice to the adverse parties if (1) specific facts in an affidavit or a verified complaint demonstrating immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition; and (2) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.  *See* Fed. R. Civ. P. 65(b)(1).

As described previously, failure to freeze the assets of Defendants and allow for monitoring of their digital wallets may preclude Plaintiff and the Class for obtaining the equitable relief available.  Upon receiving news that its investment scheme had come under the watch of regulators in America, Bitconnect quickly closed up shop and refused to provide any value for the useless BCC its users were left holding.  The Class Action Complaint filed in this Court is the second in the United States, with many more to follow.  With the known fraudulent tactics of these foreign corporations, which have failed to provide any reasonable assurances that the money stolen may still be available, the risk of dissipation is both immediate and irreparable.

Because Bitconnect is made up a series of British entities, service will be difficult and time consuming.  Moreover, Bitconnect's principals are almost all foreign nationals, and therefore it is difficult to inform the appropriate individuals of the relief sought.  Counsel has no contact information available to it aside from the addresses listed in the Complaint.  In sum, the import of protecting the equitable relief available to Plaintiff and the Class is too important to wait for

Defendants, and perhaps would only serve to give Defendants additional time to dispose of their assets. An Affidavit in Support is attached as Exhibit 1.

## CONCLUSION

By virtue of these facts, Plaintiff and the Class move this Court to enter a Temporary Restraining Order freezing Defendants' assets and requiring Defendants to provide the Court and parties with tracking information of Defendants' addresses for their Bitcoin and other digital wallets to allow the parties to monitor Defendants' assets.

Dated this 29th day of January 2018.

Respectfully submitted,

**JONES WARD PLC**

*/s/ Jasper D. Ward IV*
Jasper D. Ward IV
Alex C. Davis
The Pointe
1205 E. Washington Street, Suite 111
Louisville, Kentucky 40206
T: (502) 882-6000
jasper@jonesward.com
alex@jonesward.com
*Counsel for Plaintiff and the Class*

Abigale Rhodes Green
ABIGALE RHODES GREEN INJURY LAW, PLLC
1800 Kentucky Home Life Building
239 S. Fifth Street
Louisville, KY 40202
(502) 736-8159
agreen@arglawfirm.com
*Counsel for Plaintiff and the Class*